# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

T. R.,

        Plaintiff,

  v.

Nancy A. Berryhill, Acting Commissioner
of Social Security,

        Defendant.

Case No. 17-cv-5587 (ECW)

**AMENDED**
**ORDER**

---

This matter is before the Court on Plaintiff T. R.'s ("Plaintiff") Motion for
Summary Judgment (Dkt. No. 20) ("Motion") and Defendant Acting Commissioner of
Social Security Nancy A. Berryhill's ("Defendant") Cross Motion for Summary
Judgment (Dkt. No. 26) ("Cross Motion").  Plaintiff filed this case seeking judicial
review of a final decision by Defendant denying her application for disability insurance
benefits.  She specifically challenges the Administrative Law Judge's ("ALJ") evaluation
of Plaintiff's treating physician's opinion and the ALJ's evaluation of Plaintiff's
symptoms.  For the reasons stated below, Plaintiff's Motion is granted in part and denied
in part, and Defendant's Cross Motion is denied.

# I.    PROCEDURAL BACKGROUND

Plaintiff filed an application for disability insurance benefits on November 17, 2014, alleging disability beginning on June 15, 2013.  (R. 165-68.)[1]  She also filed an application for Supplemental Security Income on January 15, 2015, again alleging a disability beginning on June 15, 2013.  (R. 169-74.)  Plaintiff claimed disability due to Sjögren's syndrome,[2] fibromyalgia, lupus, arthritis, depression, anxiety with panic attacks, asthma, and allergies.  (R. 202.)  Her applications were denied initially and on reconsideration.  (R. 112-26.)  Plaintiff requested a hearing, which was held on December 20, 2016 before Administrative Law Judge Micah Pharris ("ALJ").  (R. 18-26.)  At all times relevant to the ALJ's adjudication, Plaintiff was a "younger" individual (under age 50) with at least a high school education and two years of college, and past relevant work in data entry and as a customer service sales representative and receptionist.  (R. 33-34.)  The ALJ issued an unfavorable decision on January 23, 2017.  (R. 18-35.)  Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a),[3] the ALJ first

---

[1]    The Social Security Administrative Record ("R.") is available at Dkt. No. 16.

[2]    Sjögren's Syndrome involves the dryness of the mucous membranes and is often associated with rheumatoid arthritis.  STEADMAN'S MEDICAL DICTIONARY, 1914 (28th ed. 2006).

[3]    The Eighth Circuit described this five-step process as follows:

The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling

determined that Plaintiff had not engaged in substantial gainful activity since June 15, 2013, the date of the alleged onset of disability. (R. 20.)

At step two, the ALJ found Plaintiff had the following severe impairments: chronic pain and fatigue "variously diagnosed" as Sjögren's syndrome, sicca syndrome,[4] myofascial pain syndrome, lupus, chronic pain syndrome, cervical degenerative disc disease, and mild lumbar degenerative disc disease. (*Id.*) At step three, the ALJ found Plaintiff's impairments did not meet or equal a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 25.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b)[5] and 416.967(b), except only occasional bilateral reaching overhead. (R.

---

impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

[4] Sicca Syndrome is otherwise referred to as Sjögren's Syndrome. STEADMAN'S MEDICAL DICTIONARY, 1913 (28th ed. 2006).

[5] Pursuant to the Social Security regulations, light work is defined as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the

27.)  With this RFC and the testimony of the Vocational Expert ("VE"), the ALJ determined that Plaintiff is capable of performing past relevant work as a data entry (sedentary exertional level), customer services sales representative (light exertional level), and receptionist (sedentary exertional level).  (R. 33-34.)  Alternatively, the ALJ determined that Plaintiff, based on her RFC and the VE testimony, is capable of performing other jobs that exist in significant numbers in the national economy, including bench assembler (DOT#706.684-022), and cashier (DOT# 211.462-010).  (R. 34.)  Both positions are at the light exertional level.  (*Id.*)  Accordingly, the ALJ deemed Plaintiff not disabled.  (R. 34-35.)

Plaintiff requested review of the decision.  (R. 1.)  The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-3.)  Plaintiff then commenced this action for judicial review.  The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.

## II.  **MEDICAL RECORD**

In April 2013, prior to the alleged June 2013 onset of disability, Plaintiff sought a transfer of care for her claimed past diagnosis of lupus, Sjögren's syndrome and

---

ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567.

rheumatoid arthritis. (R. 302.) Plaintiff had been driving a school bus at the time. (*Id.*) Her main symptoms were intermittent myalgias, mouth ulcers, and photosensitivity. Dr. Ali Saijiad, M.D., found Plaintiff's examination was "reassuringly normal." (*Id.*)

On August 20, 2013, Plaintiff saw Dr. Jennifer Lake, M.D.,[6] for fatigue and pain. (R. 345.) Plaintiff reported daily pain in all of her joints, specifically the spine. (*Id.*) She reported missing many days of work due to pain and fatigue, eventually forcing her to quit. (*Id.*) Plaintiff's general examination revealed that she was not in any distress, her head was atraumatic, her eyes were clear, her neck was supple, her back showed no vertebral angle tenderness, she showed normal range of motion of all joints, she demonstrated normal strength and sensation as part of her neurological examination, and she had a normal gait. (R. 345.) Dr. Lake assessed Plaintiff as having lupus erthematosus, sicca syndrome, and chronic fatigue syndrome. (*Id.*) She added Vicodin and Celebrex for pain to Plaintiff's prescriptions and advised Plaintiff to take daily walks. (R. 348.)

On October 1, 2013, Plaintiff saw Dr. Lake related to Sicca syndrome and pain. (R. 342.) Plaintiff claimed to have pain every day and was using Vicodin daily. (*Id.*) Plaintiff's general examination revealed that she was not in any distress, her head was atraumatic, her neck was supple, she demonstrated normal strength and sensation as part of her neurological examination, and she had a normal gait. (*Id.*)

---

[6] Both parties agree that Dr. Lake is alternatively referred to as Dr. Carpenter in the medical records and in the ALJ's decision and that Carpenter appears to be Dr. Lake's name before marriage. The Court will refer to the treating provider as Dr. Lake.

On January 13, 2014, Plaintiff saw rheumatologist Dr. Thomas Harkcom, M.D., for an evaluation of her pain, fatigue, and sicca complaints.  (R. 360.)  Plaintiff asserted that her severe fatigue started in 2005 during her third pregnancy.  (*Id.*)  Dr. Harkcom noted that Plaintiff could move about comfortably.  (R. 361.)  The examination of Plaintiff showed that her eyes were normal and that she had normal mouth moisture.  (*Id.*)  According to Dr. Harkcom, Plaintiff's shoulders, hips, knees, hands, wrists, and ankles showed full range of motion with no swelling.  (*Id.*)  Plaintiff also had normal cervical, thoracic, and lumbar spine motion.  (*Id.*)  In addition, her strength and gait were normal.  (*Id.*)  While there were past documented complaints of dry eyes and mouth, Dr. Harkcom saw nothing to suggest lupus.  (*Id.*)  Although there could have been some component of fibromyalgia, Dr. Harkcom believed it was probably due to depression.  (*Id.*)  Plaintiff noted during the examination that she planned to buy an elliptical trainer and Dr. Harkcom encouraged her in this and to start exercising for five minutes at a time and increase to 30 minutes.  (*Id.*)

On February 4, 2014, Plaintiff saw Dr. Lake for a follow-up.  (R. 339.)  Plaintiff's general examination revealed that she was not in any distress, her neck was supple, she demonstrated normal strength and sensation as part of her neurological examination, and she demonstrated a normal gait.  (R. 339.)  Dr. Lake prescribed daily exercise.  (*Id.*)  On March 12, 2014, Plaintiff had a follow-up appointment with Dr. Lake related to medication, including a refill for acetaminophen-codeine.  (R. 337.)  Plaintiff reported less pain and that she was trying to exercise.  (*Id.*)  On April 30, 2014, Plaintiff saw Dr. Lake related to her anxiety and pain.  (R. 334.)  Plaintiff's general examination revealed

that she was not in any distress, her neck was supple, she demonstrated normal strength and sensation as part of her neurological examination and had a normal gait. (*Id.*)

Plaintiff also saw Dr. Saijiad for a follow-up in April 2014 related to arthritis like pain, cervical disc degeneration, and Sicca symptoms. (R. 304.) Plaintiff reported feeling as though her hands were being hit by a sledge hammer and that her body felt like it had been hit by a semi-truck. (*Id.*) Plaintiff was referred to an ophthalmologist for eye issues secondary to sicca syndrome given her severe sicca symptoms. (R. 307.) Dr. Saijiad found no evidence of any inflammation of Plaintiff's tissues. (*Id.*)

On June 2, 2014, Plaintiff saw Dr. Lake related to her depression and pain. (R. 331.) Plaintiff reported that her pain was "all over" and had not improved. (R. 331.) Plaintiff did not appear to be in distress, her neck was supple, and exhibited no clubbing or edema in her extremities. (*Id.*) Tramadol did not work for her pain. (*Id.*) Dr. Lake recommended that Plaintiff attend a pain clinic and that she engage in daily exercise. (R. 332.)

On July 14, 2014, Plaintiff saw Dr. Harkcom with complaints of joint pain. (R. 363.) She was only able to use her elliptical for 6 minutes at a time. (*Id.*) Upon examination, Plaintiff's shoulders, elbows, knees, hands, wrists, and ankles showed full range of motion with no inflammation, and she exhibited no tender points. (*Id.*) It was unclear to Dr. Harkcom whether her condition was inflammatory in nature. (R. 364.) Dr. Harkcom started Plaintiff on prednisone and asked her to continue with her exercise and Prozac. (*Id.*)

On August 10, 2014, Plaintiff saw Dr. Anthony Genia, M.D. for facial pain. (R. 324.) While she had some tenderness in her jaw, she was not in any distress, she had a normal range of motion in her neck, and her coordination was normal. (R. 324.) Plaintiff was prescribed a muscle relaxant. (R. 326.)

On September 19, 2014, Plaintiff saw Dr. Lake related to her anxiety and medications. (R. 328.) Plaintiff also reported being very weak and in pain. (*Id.*) The immune-suppressant methotrexate prescribed by the rheumatologist did not offer Plaintiff any relief. (*Id.*) Plaintiff requested Vicodin because it worked better for her pain. (*Id.*) During the examination, Dr. Lake found Plaintiff's eyes to be clear, she was not in any distress, and she exhibited no clubbing or edema in her extremities. (*Id.*) Along with pain medications, including Tramadol and Vicodin, Dr. Lake encouraged Plaintiff to take daily walks. (R. 329.)

On August 12, 2014, Plaintiff saw Dr. Harkcom regarding a mixture of Sjögren's syndrome and fibromyalgia. (R. 365.) Plaintiff reported feeling 75% better as the result of taking prednisone. (*Id.*) She noted that she still had some discomfort in her upper back, neck, and hips. (*Id.*) Dr. Harkcom noted that Plaintiff's labs were unremarkable. (*Id.*)

Plaintiff again had a follow-up with Dr. Harkcom on November 13, 2014 complaining of "a lot" of discomfort despite using prednisone and describing her improvement with prednisone as "slight." (R. 367.) She reported that after several months on prednisone, she had not really noticed any difference. (*Id.*) Plaintiff's eyes

were unremarkable, she displayed no tender points or inflammation related to arthritis. (*Id.*) Dr. Harkcom wanted to get Plaintiff into pool therapy and tai chi. (R. 368.)

On February 4, 2015, Plaintiff saw Dr. Lake for depression and chronic fatigue. (R. 394.) Dr. Lake noted that Plaintiff had been unable to work as the result of her pain and fatigue. (*Id.*) Dr. Lake noted that Plaintiff "needs disability paperwork filled out today." (*Id.*) Plaintiff's general examination revealed that she was not in any distress, her neck was supple, she demonstrated normal strength and sensation as part of her neurological examination, and she had a normal gait. (*Id.*)

On May 6, 2015, Plaintiff saw Dr. Lake for her yearly examination. (R. 498.) Plaintiff reported having "no concerns" and that "[h]er pain is stable." (*Id.*) Plaintiff was not in any acute distress, the range of motion in her neck was normal, and her neurological examination was normal. (R. 498-99.) Dr. Lake recommended that Plaintiff exercise 30 minutes 4-5 days per week. (R. 499.)

On June 2, 2015, Plaintiff saw Dr. Harkcom for a follow-up of her Sjögren's syndrome and fibromyalgia. (R. 559.) Dr. Harkcom found Plaintiff's Sjögren's syndrome to be stable on her medications, but that she continued to have fibromyalgia-like symptoms. (*Id.*) She did receive relief from pool therapy, but she lived too far away from a pool. (*Id.*) She was also able to do yoga. (*Id.*) There were no tender points during her examination and her joints were unremarkable. (R. 560.) Dr. Harkcom's notes stated that Plaintiff had initially thought she got some benefit from her prednisone prescription, but it seemed to decrease, and noted that she had then been prescribed

methotrexate "with no benefit." (R. 559.) He prescribed prednisone again and directed her to report back in three weeks with a detailed description of her response. (R. 560.)

Plaintiff also saw Dr. Harkcom on June 25, 2015. (R. 561.) Plaintiff did not obtain any relief from her pain from the prednisone prescription, which led to Dr. Harkcom believe she was suffering from fibromyalgia. (R. 561-62.) Dr. Harkcom noted that Plaintiff "has been aggressively treated in the past for this without much success. I gave her a three-week trial of 10 mg of prednisone and she is not one shred better as far as pain. It is also disturbing her sleep." (R. 561.)

On July 28, 2015, Plaintiff continued to see Dr. Lake related to various complaints of pain, fatigue, and depression. (R. 495-96.) All of the general examinations for Plaintiff revealed that she was not in any distress, her head was atraumatic, her neck was supple, she demonstrated normal strength and sensation as part of her neurological examination, and she had a normal gait. (*Id.*) Dr. Lake started Plaintiff on Ritalin for her chronic fatigue. (R. 496.)

On September 25, 2015, Plaintiff again saw Dr. Lake for a recheck. (R. 492.) Plaintiff reported that Ritalin did not help with her fatigue. (*Id.*) Plaintiff was using Percocet 1-2 times per week for pain. (*Id.*) Plaintiff was advised to only use Vicodin for severe pain, to continue seeing her chiropractor, to take daily walks, and to see Dr. Lake again as needed. (R. 493.)

On October 18, 2015, Plaintiff was examined by nurse practitioner Nancy Nyongesa ("Nyongesa") at the United Pain Center regarding an evaluation related to complaints of headaches and low back pain. (R. 419.) Plaintiff reported that she was

taking ibuprofen daily for headaches and back pain, but that it did not help all of the time. (R. 420.) Plaintiff's back pain would improve when she laid down and worsened with increased activity and standing. (*Id.*) Plaintiff was also taking Vicodin on a rare occasion for headaches. (*Id.*) Pool therapy did not help Plaintiff. (*Id.*) Plaintiff had taken a number of other pain medications she claimed did not help with her pain, including Tylenol, Lycria, Gabapentin, Tramadol, Tylenol No. 3, and Cymbalta. (*Id.*) Plaintiff also complained about general joint pain. (*Id.*) Her physical examination showed that Plaintiff was not in any acute distress, she reported a little headache, she had full range of motion of cervical spine with no tenderness, no tenderness on her thoracic spine, and exhibited flexion and extension of the lumbar spine without any difficulty. (R. 421.) The FABER[7] test was negative bilaterally, Plaintiff's lower strength was "5/5," and she was able to walk without difficulty. (*Id.*) Nyongesa assessed Plaintiff with chronic lower back pain, chronic neck pain, and chronic headaches (frontal and occipital). (*Id.*)

On November 6, 2015, Plaintiff saw Dr. Chad Evans, M.D., for reports of a worsening headache. (R. 519.) Plaintiff was not in any acute distress, had normal sensory capability, normal reflexes, her fine motor movements were intact, her gait and balance were completely normal, and she demonstrated tenderness across the cervical and upper-thoracic spine, with particular tenderness over the occipital nerve branches. (R.

---

[7] The Flexion Abduction External Rotation (FABER) test is commonly utilized as a provocation test to detect hip, lumbar spine, or sacroiliac joint pathology. *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5159634/.

520.)  Dr. Evan was concerned about possible migraines or that Plaintiff's use of ibuprofen was contributing to her headaches.  (*Id.*)

On November 12, 2015, Plaintiff had an MRI performed on her cervical spine.  (R. 528.)  There was a small left paracentral disc herniation causing a moderate effacement to the left ventral aspect of the cervical spinal cord.  (*Id.*)  A mild posterior marginal spurring and disc bulge was also present at the C6-7 level.  (*Id.*)

On November 16, 2015, Plaintiff was seen at the Noran Neurological Clinic and examined by a physician assistant ("PA").  (R. 515.)  Plaintiff's pain had not changed since her previous visit with Dr. Evans.  (*Id.*)  Plaintiff reported that she had stopped physical therapy because it was unhelpful.  (*Id.*)  She also reported daily headaches.  (*Id.*)  The examination of Plaintiff showed that she was not in any acute distress, her neurological examination was normal, her motor examination showed normal bulk and tone with no focal asymmetries of strength.  (R. 516.)  Plaintiff's MRI of her head was normal.  (*Id.*) There was mildly limited cervical range of her spine.  (*Id.*)  A trigger-point injection was provided to Plaintiff for her neck pain.  (R. 517.)

On December 16, 2015, Plaintiff saw Dr. Lake for a medication follow-up appointment.  (R. 489.)  On the same day, Dr. Lake filled out the Medical Source Statement form at issue in this appeal.  (R. 399-406.)  Plaintiff reported being in pain most days and unable to work because of the pain.  (*Id.*)  Plaintiff was still occasionally taking a narcotic to treat her pain.  (*Id.*)  Plaintiff reported trying to exercise.  (*Id.*)  Plaintiff's general examination revealed that she was not in any distress, her head was atraumatic, her neck was supple, she demonstrated normal strength and sensation as part

of her neurological examination, and she had a normal gait.  (*Id.*)  In addition, Plaintiff exhibited a normal range of motion of all joints during her musculoskeletal examination. (*Id.*)  Dr. Lake recommended daily walks.  (R. 490.)

On January 4, 2016, Plaintiff saw Dr. Harkcom for a follow-up of her Sjögren's syndrome and fibromyalgia.  (R. 563.)  It was noted she was trying to apply for disability because of her fatigue and that her primary physician had filled out the forms.  (*Id.*)  She was engaging in regular exercise and her Sjögren's syndrome was stable.  (*Id.*)

On January 19, 2016, Plaintiff presented to Dr. Deborah Friedman, M.D., with complaints of neck pain, headaches and lower back pain.  (R. 530.)  Plaintiff complained of constant pain with daily headaches in the occipital and temporal regions and constant dull pain in her lower back.  (*Id.*)  Pain increased with sitting, standing, and daily activities.  (*Id.*)  Plaintiff reported that no activities reduced the pain.  (*Id.*)  Plaintiff did not exhibit acute distress, her motor strength was "5/5," and her coordination was normal. (R. 532.)  Plaintiff had full range of lumbar motion in flexion and extension with mild limitations and pain on lateral flexion and rotation.  (*Id.*)  The cervical range of motion was mildly limited in flexion and moderately limited in extension with significant pain. (R. 532-533.)  Cervical and spinal rehabilitation were recommended.  (R. 534.)

On January 26, 2016, Plaintiff underwent a MedX physical therapy evaluation at Physicians' Diagnostics.  (R. 470.)  Plaintiff reported a herniated disc and that she was taking ibuprofen and Vicodin daily for pain.  (*Id.*)  Plaintiff also reported that her current exercise involved walking for 30 minutes, using an elliptical machine for 6-12 minutes, stretches, yoga, and Pilates.  (*Id.*)  As part of the evaluation, the physical therapist rated

13

several motion measures, with a rating of "good" being the best and "pain" being the worst. (R. 471.) The testing demonstrated that Plaintiff largely had a "good" range of motion of the lumbar spine, cervical spine, and hips. (*Id.*) She also exhibited a "good" ability to stand. (*Id.*) Plaintiff exhibited "pain" during a cervical flexion test and "poor" scapular retraction. (*Id.*) The physical therapist rated her flexibility and mobility as "good" to "fair." (R. 472.)

During an April 11, 2016 rehabilitation appointment, Plaintiff exhibited full lumbar range of motion with pain on extension, mildly limited on lateral flexion, and rotation bilateral with pain. (R. 537.) Cervical range of motion was mildly limited at all regions with pain. (*Id.*) Cervical and lumber function and range of motion were improving, albeit slowly. (*Id.*)

On May 17, 2016, Plaintiff was seen by Dr. Evans for a follow-up for headache and neck pain. (R. 511.) Plaintiff reported decreased stiffness in her neck and increased range of motion, but complained about headaches and neck pain. (*Id.*) Nerve blocks only alleviated pain for about a day. (*Id.*) Plaintiff also reported back pain that intermediately radiated into her lower extremities. (*Id.*) Her examination was normal, with normal strength, gait, coordination, and reflexes. (R. 512.) Plaintiff's neck was supple, with no spasms. (*Id.*) There was tenderness and spasms reported in the thoracic and lumbar regions. (*Id.*) MRIs were ordered. (*Id.*)

On May 24, 2016, Plaintiff had an MRI performed of her lumbar spine that was unremarkable except for a small disc herniation at the L5-S1 with no evidence of spinal stenosis. (R. 524.) On May 24, 2016, Plaintiff had another MRI performed on her

thoracic spine.  (R. 526.)  Her thoracic spine was within normal limits, however, she showed a probable significant disc herniation of the cervical spine at C5-6 and marked degeneration at the C6-7 level.  (*Id*.)  It was suggested that an MRI of the cervical range would be appropriate to evaluate the cervical region more closely.  (*Id*.)  On June 2, 2016, Plaintiff had the follow-up MRI which showed a worsening disc protrusion at C5-6 resulting in contact and compression of the left hemi-cord with moderate canal narrowing with no abnormal signal in the cord and no foraminal narrowing.  (*Id*.)  The MRI also showed a mild posterior marginal spurring and disc bulging.  (*Id*.)

On June 3, 2016, Plaintiff was seen by Dr. Evans for headaches, cervical pain, and back pain.  (R. 540.)  Plaintiff reported worsening pain, with constant cervical pain, daily headaches, and constant lower back pain with intermittent radiation into the lower extremities.  (*Id*.)  Plaintiff was taking Vicodin and ibuprofen for pain.  (*Id*.)  Trigger point injections provided no continuing relief from pain.  (*Id*.)  Plaintiff's physical examination showed that she easily got up from a seated position and had full range of motion of her cervical spine as well as her shoulders, albeit with tenderness to palpation.  (*Id*.)  Her gait was normal.  (*Id*.)  Plaintiff also had a full range of motion of her lumbar spine with some tenderness to palpitation.  (*Id*.)  She also showed "5/5" strength in her upper and lower extremities.  (*Id*.)  Cervical pain was the most problematic for Plaintiff.  (R. 541.)

On June 14, 2016, Plaintiff was seen at Physician's Diagnostics for a discharge evaluation after completing 14 visits of the typically 24-visit MedX program.  (R. 542, 44.)  She reported that her pain was the same as when she started and that trigger point

injections were not helpful. (R. 542.) Plaintiff reported walking on an elliptical for 6-12 minutes daily which was "all she c[ould] tolerate endurance wise." (*Id.*) She was unable to complete the program because she was not tolerating the physical therapy and not progressing, even on a modified program with "very limited weights and motion." (R. 543-44.) Her complaints of pain and level of fatigue were the same as when she started. (*Id.*) Her physical examination showed that her gait was within normal limits, lumbar range was full in flexion but limited as to extension. (R. 543.) Cervical range was mildly limited. (*Id.*) Plaintiff indicated she was going to move forward with cervical radiofrequency ablation. (R. 544.)

On June 20, 2016. Plaintiff was seen at the Noran Neurological Clinic by a PA for a follow-up on her headaches neck and back pain. (R. 508.) It was reported that she was scheduled for her first cervical medial branch block. (*Id.*) Plaintiff was taking Vicodin twice a week and 3-4 ibuprofen a day. (*Id.*) Range of motion in the cervical range was decreased by approximately 30% (R. 509.) Range of motion of the lumbar showed a mild reduction and some tenderness in the thoracic region. (R. 509.)

On July 8, 2016 and July 26, 2016, Plaintiff underwent right and left radiofrequency ablation, which relieved her arthritic symptoms, but did not improve her headaches or provide her with much relief as to her cervical symptoms. (R. 546.)

Plaintiff reported to Dr. Lake on July 12, 2016 that she had been experiencing more pain, including feeling achy all over. (R. 482.) Plaintiff's general examination revealed that she was not in any distress, her head was atraumatic, her neck was supple, she demonstrated normal strength and sensation as part of her neurological examination,

and she had a normal gait.  (*Id.*)  She had not experienced any pain relief from the nerve

block that she had just received.  (*Id.*)

Plaintiff was seen by the Noran Neurological Clinic on September 27, 2016, with

reports of daily constant headaches that she had been using ibuprofen and Vicodin to

treat.  (R. 505.)  She had received a radiofrequency ablation for her neck pain.  (*Id.*)  She

was taking Percocet until she could have the same treatment performed on her back.  (*Id.*)

According to Dr. Evans, Plaintiff had chronic intractable neck pain and headaches.  (R.

506.)  Dr. Evans notes that the Plaintiff's MRI showed an enlarging disc herniation at C5-

6 that he believed was the basis for her neck pain and spasms.  (*Id.*)  Because Plaintiff

had failed to receive relief through "conservative management," she was a candidate for

anterior discectomy and fusion.  (*Id.*)

On October 6, 2016, Plaintiff saw a PA for an evaluation of back pain and upper

extremity numbness and cramping.  (R. 554, 570.)  Plaintiff described her neck pain as

feeling like "she is being beaten with a baseball bat in her neck daily."  (*Id.*)  She also

described numbness in both arms with some cramping in her hands.  (*Id.*)  Physical

therapy, steroids, and nerve root ablation did not provide Plaintiff with adequate pain

relief.  (*Id.*)  Her examination demonstrated that she had strength in her upper and lower

extremities "5/5" with no focal deficits, her sensation was intact to fine touch, and her

gait was normal.  (R. 555, 571.)  Given the size of the C5-C6 cervical disc herniation,

surgical intervention was recommended and scheduled.  (*Id.*)  Plaintiff underwent the

procedure on October 25, 2016.  (R. 595-96.)

On October 19, 2016, Plaintiff was seen by Dr. Lake for a preoperative evaluation for her cervical spinal fusion.  (R. 579.)  Dr. Lake noted Plaintiff had experienced chronic neck pain and secondary headaches for years.  (*Id.*)  Plaintiff's general examination revealed that she was not in any distress, her head was atraumatic, her eyes were clear, her neck was supple, she demonstrated normal strength and sensation as part of her neurological examination, and she had a normal gait.  (*Id.*)  She was advised to continue taking the stimulant Adderall.  (R. 581.)

On October 31, 2016, Plaintiff was seen by Dr. Lake.  (R. 577.)  Plaintiff reported doing well after her neck surgery.  (*Id.*)  Plaintiff's general examination revealed that she was not in any distress, her head was atraumatic, her eyes were clear, her neck was supple, she demonstrated normal strength and sensation as part of her neurological examination, and she had a normal gait.  (*Id.*)  She was taking Vicodin for pain and was advised to continue taking Adderall.  (R. 577-78.)

On November 17, 2016, Plaintiff presented to rheumatologist Dr. Anne E. Wolff, M.D., with reports of musculoskeletal pain and fatigue.  (R. 584.)  Plaintiff appeared to be in good health.  (R. 586.)  Plaintiff's strength was rated at "5/5" in the extremities, with sensation being grossly intact and her gait normal.  (R. 587.)  Her joints were symmetric and mostly unremarkable.  (*Id.*)  Plaintiff exhibited tenderness in the lumbar region and tight muscles in the upper back and neck.  (*Id.*)  It was unclear to Dr. Wolff as to whether Plaintiff was suffering from collagen vascular disease, which includes Sjögren's or lupus.  (*Id.*)  There was no evidence of oral ulcers, inflammation changes on her joints, or clear evidence of such an active disease.  (*Id.*)  It was also unclear whether

Plaintiff was suffering from myalgia.  (*Id.*)  While Plaintiff complained of joint pain, Dr. Wolff found no evidence of any active inflammatory arthritis.  (*Id.*)  Dr. Wolff also found no neurological weakness despite Plaintiff's complaints of overall weakness.  (*Id.*)  Dr. Wolff noted that Plaintiff claimed that one of her biggest issues was fatigue.  (R. 588.)  However, Dr. Wolff did not know whether Plaintiff's fatigue was caused by her sleep quality and recommended that Plaintiff get adequate rest.  (*Id.*)  Plaintiff also reported lower back pain.  (*Id.*)  However, Dr. Wolff only recommended conservative treatment, including stretches and pain medication for her lower back pain.  (*Id.*)  Dr. Wolff found that Plaintiff was suffering from chronic neck pain with no rheumatologic or immunological cause to explain her neck discomfort.  (*Id.*)  It was difficult to determine whether any of Plaintiff's claimed discomfort were related to degenerative changes in the spine.  (*Id.*)

On November 23, 2016, Plaintiff had a follow-up with Dr. Kyle Uittenbogaard, M.D., after her C5-C6 cervical fusion surgery.  (R. 573.)  Plaintiff reported that her lower neck pain completely resolved as did her arm numbness.  (*Id.*)  She claimed she continued to have significant upper neck pain and pain at the base of her skull that was similar to her preoperative symptoms.  (*Id.*)  Plaintiff's physical examination demonstrated a steady gait and she also sat comfortably in a chair.  (*Id.*)  Her lower and upper extremity strength was normal, and her sensation was equal.  (*Id.*)  Cervical x-rays taken showed a stable C5-C6 fusion, and there was no evidence of hardware loosening or migration.  (*Id.*)  There was satisfactory alignment.  (*Id.*)  Dr. Uittenbogaard increased Plaintiff's lifting restriction to 20 pounds.  (*Id.*)

On December 2, 2016, Plaintiff was seen for lower back pain. (R. 575.) She reported no relief with radiofrequency ablation or lumbar radial blocks, nerve blocks, or trigger point injections. (*Id.*) She reported continuing to have headaches and cervical pain. (*Id.*) Plaintiff was taking oxycodone-Tylenol. (*Id.*) Plaintiff was advised that her pain was not coming from her lumbar facet joints nor cervical facet joints based on the fact that after receiving lumbar medial branch blocks, she reported a 50% reduction in pain for the first hour but that her pain worsened by the time she got to her car. (*Id.*) Plaintiff's hearing before the ALJ was 18 days after that appointment, on December 20, 2016. (R. 18-26.)

### III. <u>DISCUSSION</u>

Plaintiff challenges the following aspects of the Commissioner's decision: (1) the weight given to the opinions of Plaintiff's treating physician Dr. Lake; and (2) the evaluation of her credibility by the ALJ. (Dkt. No. 21 at 10-20.) According to Plaintiff, the ALJ failed to properly consider Dr. Lake's opinions and therefore formulated an RFC that failed to incorporate all of her limitations. (*Id.* at 6-7.) In particular, Plaintiff asserts, in part, that Dr. Lake's opinion is not inconsistent with her treatment notes or the other medical evidence of the record. (*Id.* at 10.) The Court addresses these arguments below.

### A. Legal Standard

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g);

*Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)).  "'Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions.'"  *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)).  The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Id.*  "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome."  *Id.* (citation omitted).  In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).

"A disability claimant has the burden to establish her RFC."  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'"  *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'"  *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)).

"A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it.  An ALJ may elect under certain circumstances not to give a treating physician's opinion controlling weight.  For a treating physician's opinion to have controlling weight, it must be supported by medically acceptable laboratory and diagnostic techniques and it must not be 'inconsistent with the other substantial evidence

in [the] case record.'" *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (quoting 20

C.F.R. § 404.1527(d)(2)) (citing *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005);

*Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005)). "A treating physician's own

inconsistency may also undermine his opinion and diminish or eliminate the weight given

his opinions." *Id.* (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)); *see also*

*Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) ("However, '[a]n ALJ may

discount or even disregard the opinion of a treating physician where other medical

assessments are supported by better or more thorough medical evidence, or where a

treating physician renders inconsistent opinions that undermine the credibility of such

opinions.'") (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)) (alteration in

original) (internal quotation omitted). Moreover, "a treating physician's opinion that a

claimant is 'disabled' or 'unable to work,' does not carry 'any special significance,'

because it invades the province of the Commissioner to make the ultimate determination

of disability." *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009) (quoting 20 C.F.R.

§§ 416.927(e)(1), (3)) (citation omitted). While Plaintiff is correct that an ALJ will

normally give controlling weight to a treating physician's opinion based on their

knowledge of their patients (Dkt. No. 21 at 8-10), the case law clearly sets forth that the

weight of a such an opinion can be eliminated by an ALJ where it is inconsistent with the

provider's own treatment notes or the medical record as whole.

**B.** **The Weight Assigned to the Treating Physician's Opinion and Weight Assigned to Plaintiff's Subjective Symptoms**

On December 16, 2015, Dr. Lake, who had treated Plaintiff for Sjögren's syndrome, completed a checklist Social Security General Medical Source Statement form (R. 399-406). Dr. Lake noted that Plaintiff's prognosis was "fair." (R. 399.) When asked to identify clinical findings and objective signs of Plaintiff's Sjögren's syndrome, Dr. Lake asserted that Plaintiff had "continued pain and weakness due to chronic Sjögren's." (*Id.*)

Dr. Lake, using check marks, opined that Plaintiff's pain or other symptoms were severe enough to frequently interfere with her attention and concentration; she was incapable of even low stress jobs; she was "unable to maintain persistence and pace to engage in competitive employment;" she was unable to work on a part-time basis; she had marked limitations in activities of daily living; it was expected that she may need to lie down or recline periodically to reduce her symptoms; she would be absent four or more times per month; she was expected to experience fatigue that severely impaired her ability to work; that she could occasionally lift less than 10 pounds and never carry 10 pounds or higher; she was able to walk for one block without rest or pain; she could only sit or stand for 20 minutes at a time; and would need to change positions every 15 minutes. (R. 399-402.) Dr. Lake also opined that Plaintiff could never bend, twist, stoop, climb, kneel, crouch crawl, reach, pull, push, do overhead work, maintain static neck flexion or walk up an incline; and could occasionally grasp and rotate her neck. (R. 402.) According to Dr. Lake, Plaintiff was unable to perform repetitive activities involving her

upper extremities, but nevertheless opined that Plaintiff had good use of her hands as it relates to bilateral manual dexterity and repetitive hand-finger action, and could manipulate small objects with both hands. (R. 402-03.) Dr. Lake also opined Plaintiff could sit for about four hours in an eight-hour workday and stand/walk for less than two hours in an eight-hour workday. (R. 403.)

As it relates to Plaintiff's mental health, Dr. Lake indicated Plaintiff's depression would cause mild limitation in activities of daily living, social functioning, and concentration, persistence, or pace. (*Id.*) She opined Plaintiff was unlimited in the ability to: understand, remember, and carry out simple and complex work instructions; deal with coworkers, supervisors, and the public; and maintain attention and concentration for a two-hour segment (R. 404-05).

The ALJ gave partial weight to the mental portion of Dr. Lake's opinion and little weight to the physical portion. (R. 23, 32.) As it relates to Dr. Lake's opinions regarding Plaintiff's physical limitations, the ALJ found as follows:

> I give Dr. Lake partial weight regarding her mental limitations, however, I assign little weight to Dr. Lake's physical assessment of the claimant's abilities. Dr. Lake's limitations are completely unsupported by the evidence of record and any objective evidence in file. As stated above, the claimant's physicians cannot decide on the impairments the claimant suffers from and therefore, assign limitations to them. She apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported.

(R. 32.)

One of the ALJ's main reasons for failing to give more than "little" weight to the opinions of Dr. Lake regarding Plaintiff's physical limitations was that "[s]he apparently

relied quite heavily on the subjective report of symptoms and limitations provided by Plaintiff, and seemed to uncritically accept as true most, if not all, of what the claimant reported."[8] (*Id.*) In addition, the ALJ reasoned that "Dr. Lake's limitations are completely unsupported by the evidence of record and any objective evidence in file." (*Id.*) Thus, the ALJ's decision to give Dr. Lake's opinions as to Plaintiff's physical limitations little weight was based on the fact that Dr. Lake's opinions were based Plaintiff's subjective complaints.

"[A]n ALJ need not give a treating physician's opinion controlling weight when the opinion is based on a claimant's subjective complaints that [sic] ALJ does not find credible." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017); *see also McCoy v. Astrue*, 648 F.3d 605, 617 (8th Cir. 2011) ("Finally, the ALJ noted that Dr. Puente's evaluation appeared to be based, at least in part, on McCoy's self-reported symptoms

---

[8] The Court notes that it disagrees with the ALJ's decision to discount Dr. Lake's opinion because "the claimant's physicians cannot decide on the impairments the claimant suffers from and therefore, assign limitations to them." (R. 32.) While any opinion by Dr. Lake that Plaintiff is unable to engage in competitive employment (*see e.g.*, R. 400 ¶ 13) is not entitled to any deference, *Davidson*, 578 F.3d at 842, Dr. Lake's opinions on the nature and severity of Plaintiff's impairments are consistent with the Social Security Administration's regulatory guidance:

> **If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s)** is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527 (emphasis added).

and, thus, insofar as those reported symptoms were found to be less than credible, Dr.

Puente's report was rendered less credible.").  The Court therefore turns to the weight the

ALJ gave to Plaintiff's reports of her subjective symptoms.[9]

The ALJ found as follows regarding Plaintiff's reports of subjective symptoms:

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. . . . I am unable to conclude the claimant completely unable to work as alleged, due to significant inconsistencies in the records as a whole and a lack of objective findings to support the degree of restriction alleged, as discussed in detail below.

The claimant's course of care for the allegedly disabling physical complaints is consistent with the residual functional capacity and does not support additional restrictions.  The claimant has had only very minimal and extremely conservative care of the alleged complaints, which is not consistent with the degree of limitation alleged.  She has not sought out the treatment one would expect for the limitations alleged, and the treatment she has received has been effective and conservative in nature.  Additionally, the claimant attended the hearing and entered the hearing with no limits.  Further, physical examination findings are generally unremarkable and the claimant relates improvement of her symptoms with medication management.

(R. 28.)

Under SSR 16-3p, symptom evaluation involves a two-step evaluation.  SSR 16-

3p at 49,462.  Step one is to determine whether the individual has a medically

---

[9]     The Social Security Administration no longer uses the term "credibility" when evaluating subjective symptoms to clarify "that subjective symptom evaluation is not an examination of an individual's character."  *See* SSR 16-3p, 2017 WL 4790249, 82 Fed. Reg. 49,462 (Oct. 25, 2017).  Social Security Ruling 16-3p Titles II and XVI: Evaluations of Symptoms in Disability Claims, 2017 WL 5180304 (S.S.A. Oct. 25, 2017), applies to "determinations and decisions on or after March 28, 2016."

determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* at 49,463-64. Step two under SSR 16-3p is to evaluate the intensity and persistence of an individual's symptoms, such as pain, and determine the extent to which an individual's symptoms limit her ability to perform work-related activities. *Id.* at 49,464-66. SSR 16-3p incorporates the regulations, 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), which identify factors to be considered in evaluating the intensity, persistence and functionally-limiting effects of the symptoms, including a claimant's daily activities; the nature, duration, frequency and intensity of her symptoms; precipitating and aggravating factors; prior work record; and the type of medication and other treatment or measures used for the relief of pain and other symptoms. These factors are similar to those considered under *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). *See Baldwin v. Berryhill,* No. 3:16CV00341-JTR, 2017 WL 6055383, at *4 (E.D. Ark. Dec. 7, 2017) ("SSR 16-3p . . . still incorporates the same factors discussed in *Polaski* and requires the ALJ to make a determination based on all evidence in the record.") (citations omitted). An ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent, and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p at 14,171. However, an ALJ need not explicitly discuss each factor. *See Goff*, 421 F.3d at 791.

The ALJ followed the two-step procedure set forth in SSR 16-3p.[10]  At step one, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. . . ."  (R. 28.)  At step two, the ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (*Id.*)  The ALJ relied on the following bases for his findings: Plaintiff's course of care for the allegedly disabling physical complaints did not support additional restrictions; Plaintiff had "only very minimal and extremely conservative care of the alleged complaints;" Plaintiff "ha[d] not sought out the treatment one would expect for the limitations alleged;" although she had one surgery in October 2016 the treatment she has received had been "effective and conservative in nature;" Plaintiff attended the hearing and entered the hearing with no limits; Plaintiff's physical examination findings were generally unremarkable; Plaintiff "relate[d] improvement of her symptoms with medication management;" and Plaintiff described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. (R. 28, 30-31.)  As explained below, many of these bases run afoul of the requirement that an ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent, and supported by the evidence, and be clearly

---

[10]     To the extent Plaintiff contends the ALJ made a finding as to her "credibility" in the sense of her character, the Court finds no support for this contention in the ALJ's decision.

articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p at 14,171.

The Court turns first to the ALJ's statement that Plaintiff's symptoms are not consistent with the medical evidence and other evidence in the record.  This assertion is based in part on his determination that Plaintiff's physical examination findings were generally unremarkable.  Even assuming this finding is supported by substantial evidence in the record as a whole, despite the MRIs taken of Plaintiff's cervical spine showing a disc herniation in 2015 and 2016 (R. 528, 524-26), the "ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence."  *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010); *see also* SSR 16-3p ("However, we will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual.  A report of minimal or negative findings or inconsistencies in the objective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms.").

The ALJ acknowledged that he could not discount Plaintiff's subjective complaints solely due to unremarkable physical examinations, as shown by his discussion of the treatment received by Plaintiff and her daily activities.  However, the ALJ's characterization of the treatment received by Plaintiff as "very minimal and extremely conservative" and "relatively limited and conservative overall" is not supported by the evidence.  (R. 28, 31.)  Over the course of three years, Plaintiff sought treatment for

chronic pain and fatigue over 30 times and was treated with strong prescription medications (including narcotic pain medications), trigger point injections, nerve blocks, a radiofrequency ablation, physical therapy, and even cervical spine fusion surgery. The level of treatment received by Plaintiff is not minimal nor extremely conservative. *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) (finding claimant had not received minimum treatment when she made numerous doctor visits; taken many prescription medications; availed herself of many pain treatment modalities, including physical therapy, trigger point injections of cortisone, chiropractic treatments, and nerve blocks; and has had several surgeries and many diagnostic tests, including X-rays, CT scans, DNA tests, MRIs, and blood work). Indeed, Plaintiff's treatment history supports her reports of subjective symptoms. *See Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000) (repeated and consistent doctor visits coupled with many diagnostic tests, taking numerous prescription medications and use of many pain treatment modalities supported claimant's subjective complaints of pain).

Next, the Court addresses the ALJ's assertions that Plaintiff failed to seek out the treatment one would expect for the limitations alleged and "did not generally receive the type of medical treatment during the period at issue that one would expect for a totally disabled individual." (R. 28, 31.) These assertions about the "treatment one would expect" Plaintiff to have sought and received appear to be medical opinions. *See Willcockson v. Astrue*, 540 F.3d 878, 881 (8th Cir. 2008) (ALJ's statement that "he did not accept [claimant's] testimony regarding her pain because 'the severity of the claimant's symptoms is disproportionate in comparison to the usual expected severity of

her condition'" appeared at first blush to "to be a medical conclusion"). "Of course, the ALJ is not qualified to give a medical opinion but may rely on medical evidence in the record." *Id.* It is unclear to the Court what evidence the ALJ relied upon as showing the medical treatment Plaintiff would have been expected to seek based on the claimed limitations. On remand, if the ALJ continues to believe the Plaintiff did not seek or receive the treatment one would expect, the ALJ should clarify what medical evidence he relied on when making that determination.

The ALJ's assertion that the treatment has been effective also is not supported by the record as a whole over the entire time period at issue. While Plaintiff reported limited instances of stable pain between May and June 2015 (*see e.g.*, R. 498, 559), as set forth above, Plaintiff continued to seek a variety of treatments for her continuing pain through the last date of the available medical record, which was 18 days before the December 20, 2016 hearing before the ALJ. She reported continuing to have headaches and cervical pain even after undergoing the invasive cervical surgery fusion surgery, was taking oxycodone-Tylenol for pain relief, and was planning on returning to the Noran Neurological Clinic to discuss her continued headaches. (R. 575.) In addition, Plaintiff continued to experience lumbar back pain despite treatment with radiofrequency ablation, lumbar radial blocks, nerve blocks, and trigger point injections. (*Id.*) Despite the fact Plaintiff continued to take medications for her fatigue, there is nothing to indicate that any of these medications assisted Plaintiff. (*See, e.g.*, R. 345, 492, 486-87, 584.)

Finally, the ALJ reduced Plaintiff's RFC "with regard to using her neck and joint pains" by imposing a limitation on overhead reaching to address Plaintiff's cervical

degenerative disease, but found that the Plaintiff could perform all the other necessary tasks encompassed in her light RFC. (R. 33.) The ALJ's rationale for imposing only overhead reaching limitations is unclear.

Because part of the ALJ's analysis regarding Plaintiff's subjective symptoms does not appear to be supported by the record, and the fact that the evidence as a whole does not weigh so heavily against Plaintiff's subjective symptoms that the ALJ would necessarily have disbelieved Plaintiff absent the ALJ's erroneous inferences from the record, the Court finds that remand is required.[11] *See Ford v. Astrue*, 518 F.3d 979, 982-83 (8th Cir. 2008) (remanding for further consideration where the ALJ gave some good reasons for discounting Plaintiff's credibility but also gave reasons not supported by the record, relied on inconsistencies that were not actually inconsistencies, and relied on a plaintiff's account of limited daily activities that were not actually inconsistent with her complaints of pain; concluding that "[a]fter careful consideration of the record in this case, we cannot say that it weighs so heavily against [the plaintiff's] credibility that the ALJ would necessarily have disbelieved her absent the erroneous inferences that he drew from the record"); *Brosnahan v. Barnhart*, 336 F.3d 671, 677-78 (8th Cir. 2003) (remanding where the ALJ gave several reasons for discounting the plaintiff's credibility that were contradicted by the record). On remand, the ALJ should conduct a new symptom analysis that fully considers Plaintiff's treatment and medications related to her

---

[11]    The Court rejects Defendant's assertion that Plaintiff failed to provide a fully developed argument contesting the finding that her subjective symptoms were inconsistent with the record as a whole beyond the issue of work history.

neck pain, lower lumbar pain, headaches, and fatigue as part of the RFC assigned to Plaintiff. To the extent the ALJ assigns less weight to Plaintiff's subjective symptoms, he should identify and clearly articulate the specific reasons for the weight assigned as well identify as the evidence the ALJ relied on to support his determination. The ALJ will also be required to take into account Plaintiff's work history and all of the other relevant factors when determining what weight to assign Plaintiff's reports of subjective symptoms.[12]

Because the Court is ordering remand as to the ALJ's determination regarding Plaintiff's subjective symptoms, the Court is not in a position to rule as to whether the ALJ provided proper weight to Dr. Lake's opinions regarding Plaintiff's physical functional capacity. On remand the ALJ also should revisit the weight provided to Dr. Lake's opinion depending on his reevaluation of Plaintiff's claimed symptoms. Further, in light of the Court's determination that the ALJ may not have adequately considered Plaintiff's symptoms, the hypothetical originally proposed to the vocational expert may also have been incorrect. *See Scott v. Berryhill*, 855 F.3d 853, 857 (8th Cir. 2017) (a properly phrased hypothetical includes limitations mirroring those of claimant). Therefore, if the ALJ's decision regarding Plaintiff's symptoms changes, the ALJ should make any necessary adjustments to the hypothetical, and solicit new testimony from a

---

[12] Plaintiff also challenges the weight assigned to Plaintiff's subjective symptoms on the ground that ALJ failed to acknowledge her strong work history. (Dkt. No. 21 at 18-19.) Because the Court is remanding this case for further proceedings with respect to the weight attributed to Plaintiff's subjective symptoms, the Court need not address this argument at this time.

vocational expert as to Plaintiff's continuing ability to perform any jobs existing in the national economy.

## IV.  ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.  Plaintiff T. R.'s Motion for Summary Judgment (Dkt. No. 20) is **GRANTED IN PART** and **DENIED IN PART**;

2.  Defendant Acting Commissioner of Social Security Nancy A. Berryhill's Cross Motion for Summary Judgment (Dkt. No. 26) is **DENIED**;

3.  This case is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Order; and

4.  This case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED: March 8, 2019                    *s/Elizabeth Cowan Wright*
                                        ELIZABETH COWAN WRIGHT
                                        United States Magistrate Judge